The Honorable David G. Estudillo

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

ERITREAN ASSOCIATION IN GREATER SEATTLE, a Washington Not for Profit Corporation,

Plaintiff,

vs.

HENOCK TECKLE GEBREKIDAN, a Maryland citizen, SABA KIDANE HERITAGE, a California citizen, AWET TSEHAYE, an Oklahoma citizen, ELEN TESFAGHIORGHIS, a Texas citizen, SOLOMON GEBREYESUS, a California citizen, YORDANOS GEBREMICHAEL GEBREGIORGIS, a California citizen, TEMESGHEN KAHSAY, a North Carolina citizen, HAILE ANGESOM TSEADA, a California citizen, AFEWERKI TESFAMARIAM, a Georgia citizen, YONATAN TEWELDE, a Pennsylvania citizen, ESAYAS TEWOLDE TESFAMICAEL, a Pennsylvania citizen, GEBREHIWET TEKLEHAIMANOT, a California citizen, HADUSH BRHANE, a Kentucky citizen, and DOES 1 through 150, inclusive,

Defendants.

Case No. 3:24-cv-05517-DGE

**JOINT DISCOVERY DISPUTE STATEMENT NO. 1**

JOINT DISCOVERY DISPUTE STATEMENT

The parties Joint Discovery Statement Issue Number One: On November 4, 2025, Defendants filed a motion for sanctions under Federal Rule of Civil Procedure 37)b).  The Court struck the motion (Dkt. No. [110].  The Court ordered the parties to meet and confer to discuss the discovery issues identified in Defendants motion and to submit a joint discovery dispute statement by November 17, 2025.

**A.  Plaintiff's Position:**

1.    **<u>Joint Discovery Dispute Issue Number One</u>**:  Defendants filed a motion opposing the deposition notices of each defendant on the grounds that there was a government shutdown, the holidays were upon them, and Plaintiff was seeking documents but did not give the Defendants 30 days-notice.

   a.  Defendants' position is in error because  of the following reasons:

      i.    The Depositions notices were sent on November 4, 2025.

      ii.   The first deposition was noticed for November 20, and the remaining depositions were noticed for later in November, December and January.

      iii.  Under the local and Federal Rule of Civil Procedure (FRCP) 30(b)(1) governing the Western District of Washington: A deposition with documents requires "reasonable written notice" to every other party of at least 14 days.

         1.  Defendants were given more than 14 days' notice for the first deposition and more than 30 days' notice for half of the depositions noticed.

         2.  Defendants' motion expressed that the depositions were not proper because there was a government shutdown and the depositions interfered with their holiday season. Plaintiff counsel could not identify a legal reason for opposing a deposition during a government shutdown.

   b.  None of the depositions were scheduled on a legal holiday.  Defendants opposed the deposition notices because they included a request for documents.  A request

JOINT DISCOVERY DISPUTE STATEMENT - 1

asking for documents attached to a deposition notice is proper under the federal rules:

    i.    A party in federal court **can** request documents in a noticed deposition (specifically, a **Rule 30(b)(5) notice for a party** or a **Rule 45 subpoena for a non-party**) that were previously requested in a Rule 34 written discovery request.

**B. Defendants' Position: Non-Responsive to the Court's Order.**

1.    **Joint Discovery Dispute Issue Number One Part Two**: On June 30, Plaintiff noticed and took the deposition of Defendant Yonatan Tewelde. On that date counsel for Defendant instructed the Defendant not to answer Plaintiff's questions approximately 15 times. The basis for instructing the witness not to answer was based on a non-existent Protective Order. (Exhibit A).  On July 1, Plaintiff noticed the deposition and took the deposition of Defendant Elen Teseaghiorghis.  On that date counsel instructed the witness not to answer approximately 33 times based on the same non-existent Protective Order.  (Exhibit B). The transcript of both Defendants identifying the question asked of each defendant and the instruction given by defense counsel ordering the Defendants not to answer are attached and highlighted.

**C. Defendants' Position:  Non-Responsive to Court's Order.**

This Joint Discovery Dispute Statement is soley filed by the Plaintiff as Defendants' statement is unresponsive to the Court's order.

Respectfully submitted,

Dated: November 17, 2025      **WYATT GRONKSKI PLLC**

By:  */s/ Todd Wyatt*
      TODD WYATT, WSBA #31608
      Attorneys for Plaintiff
      ERITREAN ASSOCIATION IN GREATER SEATTLE
      540 Newport Way NW, Suite 200
      Issaquah, WA 98027
      T: 425-395-7784
      E: todd@wdlawgroup.com

JOINT DISCOVERY DISPUTE STATEMENT - 2

Dated: November 17, 2025                    **PROMETHEUS PARTNERS L.L.P.**


By:  */s/ Eduardo G. Roy*
　　　　EDUARDO G. ROY
　　　　Attorneys for Plaintiff
　　　　ERITREAN ASSOCIATION IN GREATER
　　　　SEATTLE
　　　　*PRO HAC VICE*
　　　　1950 Broadway, 30th Floor, Suite 3011
　　　　Oakland, CA 94612
　　　　T: 415.527.0255
　　　　E: eduardo.roy@prometheus-law.com

JOINT DISCOVERY DISPUTE STATEMENT - 3

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

- - - - - - - - - - - - - - - - -

ERITREAN ASSOCIATION IN          )

GREATER SEATTLE, a Washington    )  CASE NO.

Not for Profit Corporation,      )  3:24-cv-055517-DGE

                 Plaintiff,      )

       vs.                       )

HENOCK TECKLE GEBREKIDAN, a      )

Maryland citizen; et al.,        )

                 Defendants.     )

- - - - - - - - - - - - - - - - -

DEPOSITION OF YONATAN TEWELDE

MONDAY, JUNE 30, 2025

PAGES 1 - 248; VOLUME 1

BEHMKE REPORTING AND VIDEO, SERVICES, INC.

BY:  LAUREN G. HARTY, RPR, CCR NO. 2674

550 CALIFORNIA STREET, SUITE 820

SAN FRANCISCO, CALIFORNIA  94104

(415) 597-5600

A.    No.

Q.    Does Henock?

A.    Sorry?

Q.    Does Henock receive a salary?

A.    No.  We don't make any profit, so --

Q.    Who was involved in planning your trip to the Eritrean festival?

MR. STOCKWELL:  Objection; protective order.

MR. ROY:  There's no protective order in place.

MR. STOCKWELL:  Pending protective order. Don't answer the question.

MR. ROY:  There's no pending protective order in place.

MR. STOCKWELL:  There's a motion, pending protective order motion.  Okay?

MR. ROY:  Are you instructing him not to answer?

MR. STOCKWELL:  Yes.

(Interruption.)

(Discussion off the record.)

MR. ROY:  I'm sorry, Counsel.  Someone came in when we were discussing this.  What is your objection based on?

MR. STOCKWELL:  Based on the fact that

about the festival.  And all of that was aired to Eritrea and to Eritrean viewers.

MR. ROY:  Madam Court Reporter, may I ask that every time opposing counsel instructs his witness not to answer, can you mark that spot?

THE REPORTER:  Let's go off the record.

(Discussion off the record.)

MR. ROY:  Madam Court Reporter, can you read back the last question and answer?

(The reporter read back as requested.)

Q.   (By Mr. Roy)  Who did you communicate with when you decided to attend the festival?

MR. STOCKWELL:  Objection; pending motion for protective order, journalist privilege, First Amendment privilege.

MR. ROY:  Are you instructing him not to answer?

MR. STOCKWELL:  Correct.

MR. ROY:  Counsel, just so that we have a clear record, can you state, "Objection; instruct him not to answer," and, of course, any --

MR. STOCKWELL:  Of --

MR. ROY:  -- other --

MR. STOCKWELL:  -- course.

MR. ROY:  But you -- so I'm clear that

A.    Again, I -- the exact way I learned about how that commemorative event was happening, I can't recall that because this is something that happened like two years ago.  As I said, my main goal here was to come and cover the protest.  That's why I came a day earlier, so I can -- I can get set up.

But then somehow I found out that there was this commemorative event taking place, and this was obviously interesting to me.  And I -- but the manner of how I found out that this thing was taking place I can't exactly recall.

Q.    At the commemorative event did any protesters show up?

A.    Yeah.  Many of the individuals who protested at the festival were there.

Q.    Okay.

Which hotel did you stay at?

A.    I -- we stayed at an AirBnB.

Q.    Were there any other protesters staying at your AirBnB?

A.    Yes, there were.

Q.    Who?

MR. STOCKWELL:  Objection; protective order, motion for protective order, First Amendment privilege and journalist privilege.

Q.    Once you air your stories do you broadcast it on other mediums?

A.    Well, sometimes for promotional purposes, like a few clips from the documentaries or shows, we share it on social media platforms like -- like Facebook, sometimes on TikTok.  Sometimes I share some of -- a part or all of the documentaries or shows that I produce on my YouTube channel as well because I was -- I was also trying to grow that platform as well.  So those are also other avenues or platforms that I use for my work.

Q.    Do you raise money based on your stories that you publish?

A.    Nothing significant.

Q.    How do you try to raise the money?  Through what avenues?  Crowd -- what kind of crowd sources do you do?

MR. STOCKWELL:  Objection; motion for protective order, journalist privilege, First Amendment privilege.

Instruct the deponent not to answer.

MR. ROY:  Okay.

Q.    (By Mr. Roy)  So you do raise money based on your stories, correct?

A.    Based on my content, right.

our work.

Q.    How do you raise funds?

A.    For ERIPM?

Q.    Yes.

A.    Well, we ask for donations via like -- you know, like make calls to people.  We have the websites.  We have a donor box in the website if you go to eripm.com.  And then we raise as much money as -- as we can.  But the most or the highest amount of revenue that we find is going to be from the work that is published on YouTube and the amount -- the -- the money that we raise from YouTube revenues.

Q.    Who did you communicate with when you decided to attend the festival?

MR. STOCKWELL:  Objection; motion for protective order, journalist privilege, First Amendment privilege.

Instruct the deponent not to answer.

Q.    (By Mr. Roy)  How many stories did you produce in 2023?

A.    I was producing one -- at least one story per week.  So that would be about four -- four TV shows per month.

Q.    How many stories did you produce in 2024?

A.    So would that be the -- the contents?

the protest was I edited a video, which was sent to me by some members of -- of Seattle. And they used this billboard truck which was running around Seattle to try to raise awareness about the festival. So the only involvement that I had before was just that.

Q. Okay.

So when was this? What date?

A. When did I edit the video?

Q. Yes.

A. I don't know, exactly recall the date, but it would -- it would be a few weeks before the festival.

Q. And who sent the video to you?

A. Third --

MR. STOCKWELL: Objection.

A. -- parties.

MR. STOCKWELL: That's going to be the motion for protective order, journalist privilege, and the First Amendment privilege.

And I'm going to direct the deponent not to answer that.

MR. ROY: Okay. Let me just -- let's mark that.

Q. (By Mr. Roy) Let's ask some questions around it. Were you sent the video by someone to edit in

A.    I -- I -- I should.

Q.    Can you give a copy of that video to your attorney to turn over to us?

A.    Certainly.

Q.    Okay.  As part of the discovery requests it's your obligation to turn it over.

A.    And then, again, that was one of the things that we had time concerns about, but upon discussion with my attorney, I can certainly turn that over.

Q.    And at -- right now you won't identify who the individual was that sent it to you, correct?

A.    Yes.

Q.    Okay.

      Was that individual part of an organization?

      MR. STOCKWELL:  Objection; motion for protective order, journalist privilege, First Amendment privilege.

      I direct the deponent not to answer that question.

Q.    (By Mr. Roy)  Is that individual a co-defendant?

      MR. STOCKWELL:  Objection.  Same objection.

Q.    (By Mr. Roy)  Did you see that individual at the protest?

A.    It wasn't one individual, so there were at

here both in Seattle and in the United States needed to understand why there were protests and why this festival was controversial to us.

So the protest itself was -- the protest and all the activities that were taking place were -- were along the lines of creating awareness. And I was glad to participate in things that were peaceful, including things such as sending letters or producing videos, as I believed my First Amendment right to do so.

Q.    So -- well -- so you were --

MR. ROY: Madam Court Reporter, can you read back just the last answer?

(The reporter read back as requested.)

Q.    (By Mr. Roy) And so you said that you agreed with the message, correct?

A.    Yes.

Q.    This was a message of the video that they asked you to produce, correct?

A.    Uh-huh.

Q.    And they -- can you identify who they are?

A.    The individuals?

MR. STOCKWELL: Objection.

Q.    (By Mr. Roy) Yes.

MR. STOCKWELL: Motion for protective order, First Amendment privilege, journalist privilege.

Eritrea.  Were you exiled by the government?

A.    Yes, because I cannot freely participate or I cannot freely engage in my work and profession as a journalist in Eritrea because Eritrea has literally the worst record of human rights, especially of press freedom, in the world.

And me -- as I already mentioned, my first degree is in journalism and mass communication, and my lifelong goal was to work and serve as a journalist in Eritrea.  And I was not able to do that.

A lot of my colleagues were arrested since two -- the year 2000, for 25 years.  I have been harassed in Eritrea.  I continue to suffer a lot of harassments.  And I consider myself to be in exile because I cannot return to Eritrea when these things are going on.

Q.    Identify the harassment that you've received from the Eritrean government.

A.    I -- I don't feel comfortable talking about the harassment of the Eritrean government in this case.

MR. STOCKWELL:  Objection; contents of the motion for protective order, safety concerns.

I'm going to direct him not to answer the question.

Q.    Where did you find the video?

A.    As a -- I -- as -- as a journalist I would have to protect my -- my witness --

MR. STOCKWELL:   Objection.

A.    -- to --

MR. STOCKWELL:   This is a journalist privilege asserted.

And I'm going to direct him not to answer that question.

MR. ROY:   Madam Court Reporter, can you mark that, please?

Q.    (By Mr. Roy)   Well -- did someone send the video to you?

MR. STOCKWELL:   Ob- --

A.    Yes.

MR. STOCKWELL:   -- jection; journalist privilege.

Direct him not to answer that.

Q.    (By Mr. Roy)   When was the video sent to you?

A.    The video was sent to me recently, not longer than three, four months ago I would say.

Q.    Okay.

Was the video sent to you by a co-defendant?

MR. STOCKWELL:   Objection; journalist privilege.

STATE OF WASHINGTON      ) ss.

COUNTY OF KING           )

I, the undersigned Washington Certified Court Reporter, hereby certify that the foregoing deposition of YONATAN TEWELDE was taken before me on June 30, 2025, and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true, and correct transcript to the best of my ability; that I am neither attorney for nor a relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto, nor am I financially interested in its outcome;

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of July, 2025.

Read and Sign was:  Requested.

LAUREN G. HARTY, RPR, CCR NO. 2674

STATE OF WASHINGTON

# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

- - - - - - - - - - - - - - - - -

ERITREAN ASSOCIATION IN            )
GREATER SEATTLE, a Washington   )   CASE NO.
Not for Profit Corporation,         )   3:24-cv-055517-DGE
                Plaintiff,          )
        vs.                         )
HENOCK TECKLE GEBREKIDAN, a      )
Maryland citizen; et al.,           )
                Defendants.         )

- - - - - - - - - - - - - - - - -

DEPOSITION OF ELEN TESFAGHIORGHIS

TUESDAY, JULY 1, 2025

PAGES 1 - 159; VOLUME 1

BEHMKE REPORTING AND VIDEO, SERVICES, INC.

BY:  TERILYNN SIMONS, CCR NO. 2047, RMR, CRR

550 CALIFORNIA STREET, SUITE 820

SAN FRANCISCO, CALIFORNIA  94104

(415) 597-5600

Q    But you would have authorized it?

You authorized the fundraising--

A    I authorize?  No.

MR. STOCKWELL:  Objection; mischaracterizes earlier testimony.

Q    (By Mr. Roy)  So my question is:

While you were a board member, did you authorize any online fundraising?

A    No.

Q    Were you a part of any online fundraising?

A    Like I said, my name would appear because my name is on the bank account.

Q    Who was on the board of the Yiakl board in the U.S.?

THE WITNESS:  Do I have to answer that?

MR. STOCKWELL:  I am going to object on the basis of the motion for protective order that's pending and the safety concerns attached to that and her First Amendment privilege, and I will direct her not to answer.

MR. ROY:  Madam Court Reporter, can you please read back the question?

(Section(s) designated were read by the reporter.)

Q    (By Mr. Roy)  When you were on the board-- you were on

the board in 2019 to 2022?

A    Correct.

Q    Who were the board members?

MR. STOCKWELL:  I am going to object on the basis of the motion for protective order that is pending and safety concerns in it and her First Amendment privilege, and I will direct her not to answer.

MR. ROY:  Madam Court Reporter, can you mark any time counsel says that he directs the witness not to answer so we can find it easily when we get the transcript?

Q    (By Mr. Roy)  What were the salaries of the board members for the Yiakl board members from 2019 to 2022?

A    What salary?

Q    Did they receive salaries?

MR. STOCKWELL:  You can answer that if you know.

THE WITNESS:  You need to rephrase exactly what you are asking.

Q    (By Mr. Roy)  Okay.  How many people were on the Yiakl board from 2019 to 2022?

A    So when you ask-- because my role in here is as a person. As an individual I attend this peaceful protest in Seattle, but I am not-- I don't want to answer about that because that's my right to, you know, fight for justice.

I am not here to answer that.

Q    Unless your attorney instructs you not to answer, you have to answer the question.

MR. STOCKWELL:    If she's citing that she has safety concerns around the question, then I am going to make the same objection.

MR. ROY:    She did not say--

MR. STOCKWELL:    Do you have safety concerns around answering this question?

THE WITNESS:    Yes, sir.

Q    (By Mr. Roy)    What are the safety concerns?

MR. STOCKWELL:    I object to the question on the basis of a pending motion for protective order, the safety concerns in it, her First Amendment privilege, and I will direct her not to answer.

Q    (By Mr. Roy)    What are your safety concerns?

MR. STOCKWELL:    Objection. The objection has been made, and now this is becoming harassing, and if I have to make the motion again to end the deposition, I will. The objection has been made.    You need to ask your questions or need to leave.

Q    (By Mr. Roy)    My question is: What are your safety concerns?

MR. STOCKWELL:    Objection.

question.

MR. ROY:  There is no question posed.

MR. STOCKWELL:  All right.

Q   (By Mr. Roy)  In the second full paragraph-- in the first full paragraph of Page 2 of your affidavit, it says, "The protest was organized to denounce the Eritrean regime's continued repression and to stand in solidarity with the voiceless Eritrean people, including my family members who remain at risk back home."

Who organized the protest of the Eritrean festival in Tacoma in 2023?

A   That is my reason.  I don't want to speak about anybody.

MR. STOCKWELL:  Objection.  It's asked and answered.

Go ahead and answer.

THE WITNESS:  Okay.

Q   (By Mr. Roy)  Answer the question, please.

A   So I don't want to give anybody's name, for their safety.

Q   Ma'am, you have signed this affidavit--

MR. STOCKWELL:  Can you repeat the question so I can get an objection clear?

MR. ROY:  Madame Court Reporter, can you read back my last question?

(Section(s) designated were read by the reporter.)

MR. STOCKWELL: Objection on the basis of the pending motion for protective order and First Amendment privilege and direct her not to answer that question.

MR. ROY: Counsel, you understand that you submitted this declaration on her behalf, correct?

MR. STOCKWELL: She didn't name anyone in the affidavit.

MR. ROY: She said the protest was organized to denounce the Eritrean regime's continued repression--

MR. STOCKWELL: I am not here to be examined.

MR. ROY: I am not examining you. I am examining her.

Q   (By Mr. Roy) Who are you referring to when you say it was organized? It was organized by who?

MR. STOCKWELL: I will state my same objection and instruct her not to answer.

MR. ROY: We will be going to the Court and we will be bringing you back again.

MR. STOCKWELL: We will be bringing her back again if that's what the Court decides. We will leave it to Judge Estudio's ruling.

Q   (By Mr. Roy) The next paragraph says, "I believe this

discussing about us, that you are going to come after our homes, after our jobs, and even accusing us of overthrowing the Eritrean government, and you told the audience, "We will get them"-- you were saying all this.

I am even-- don't even feel comfortable.

Q    (By Mr. Roy)  My question is:

What evidence do you have that the Eritrean Association of Greater Seattle is known to have close affiliation with the Eritrean government?

MR. STOCKWELL:  Objection.

She's made it clear that she has safety concerns around answering that question.

I will lean on, again, the motion for protective order, her First Amendment privilege, and direct her not to answer the question.

Q    (By Mr. Roy)  Going to the third full paragraph, it says, "According to credible international human rights sources, including the United Nations special rapporteur on the situation of human rights in Eritrea, the Eritrean government systematically"-- and then you have five bullet points.

Looking at the first bullet point, it says, "Intimidates, harasses, and silences pro-democracy activists, journalists, and critics living abroad through threats, surveillance, online abuse, and withholding of

essential consular services unless political compliance is shown."

Do you have any evidence to tie EAGS, the Eritrean Association of Greater Seattle, to any of the facts in the first bullet point?

A So even the reason why I'm here.

MR. STOCKWELL: Objection; asked and answered, and answer to the extent that you can, that does not invoke any safety concerns or your First Amendment privilege.

If you can't answer, then say, "I can't answer."

THE WITNESS: I don't want to answer. I can't answer.

MR. STOCKWELL: I will direct her not to answer.

MR. ROY: You are directing her not to answer that?

MR. STOCKWELL: Yes, that's correct.

Q (By Mr. Roy) Ma'am, looking at the second bullet point, what evidence do you have to tie the Eritrean Association of Greater Seattle to the second bullet point that says, "Engages in forced returns and detention, with credible reports of extrajudicial killings, kidnappings, and coercion of individuals to return to Tigray for political motivated punishment."

in polarization and sometimes violent clashes between regime supporters and opponents."

What facts do you have to tie EAGS to the facts in the third bullet point?

MR. STOCKWELL:  Objection; asked and answered.

MR. ROY:  Please answer the question.

MR. STOCKWELL:  I will object.

Let's make this a standing objection.  It's just objection on the basis of the safety concerns contained within the motion for protective order and the First Amendment privilege, and I am going to direct her not to answer.

From here on out I am just going to say, "Standing objection" and direct her not to answer.

Q   (By Mr. Roy)  Ma'am, what evidence do you have to tie EAGS, the Eritrean Association of Greater Seattle, to the fourth bullet point?

MR. STOCKWELL:  Standing objection.  I will direct her not to answer, and asked and answered.

Q   (By Mr. Roy)  To the fourth bullet point that says, "Aligns strategically with authoritarian regimes, particularly Russia, as evidenced by Eritrea's consistent opposition to UN resolutions condemning Russia's actions

in Ukraine"?

MR. STOCKWELL:  Standing objection.

I will instruct her not to answer.

Q    (By Mr. Roy)  What evidence do you have to tie EAGS to the fifth bullet point that states, "Cultivated relationships with regimes, such as Russia and China, in a broader strategy to maintain its isolationist stance and deflect international criticism, often by promoting anti-U.S. sentiment"?

MR. STOCKWELL:  Standing objection.

I will instruct her not to answer.

Q    (By Mr. Roy)  Okay.  Ma'am, looking again at your affidavit, it is a little difficult to follow your affidavit because the affidavit is not numbered by paragraphs, which is violating code, and it is single spaced when it should be double spaced--

MR. STOCKWELL:  Objection.  Counsel is testifying.

Ask a question.

MR. ROY:  I am trying to describe where I am pointing to because the affidavits are not numbered by page.  The affidavits are not numbered by paragraph.  The affidavits are single spaced as opposed to double spaced, which is required by the local rules, so I am trying to direct her to where I am trying to

A    I am an activist.  I am an activist from day one.

Q    So when you say "activist," you are referring to yourself, correct?

A    Yes.  I am an activist speaking of my people.

Q    There where it says, "1)," it goes on to say, "Surveillance and intimidation on my extended family members in Eritrea through phone calls and personal interrogations to keep me silent from being the voice of the voiceless by applying my First Amendment rights," you wrote that, correct?

A    Yes, sir.

Q    My question is:
     Which family members have been surveilled by who?

         MR. STOCKWELL:  Standing objection.
     I will direct her not to answer that question.

Q    (By Mr. Roy)  Which family members are receiving phone calls?

         MR. STOCKWELL:  Standing objection.
     I will direct her not to answer that question.

Q    (By Mr. Roy)  Have any of your family members been personally interrogated?

         MR. STOCKWELL:  Standing objection.
     I direct her not to answer that question.

Q    (By Mr. Roy)  Why do you believe anything was done to your family to keep you silent?

picture.

MR. STOCKWELL:  You have to wait for a question.

THE WITNESS:  Okay.

Q   (By Mr. Roy)  Your affidavit goes on to say, "In conclusion, I am very concerned for my safety and the safety of my family that the Plaintiff is asking discovery of all private communications, political affiliations, organizational records, and potentially the names of other Eritrean dissidents.

"knowing EAGS' ties to the Eritrean government entities, gathering such information is meant to harm me. I respectfully request that the Court issue a protective order to prevent the plaintiff from accessing such endangering requests."

Can you identify the ties of EAGS to the Eritrean government?

MR. STOCKWELL:  Objection; standing objection.

I will instruct her not to answer that.

It's been asked and answered.

Q   (By Mr. Roy)  Ma'am, did you write this declaration yourself?

A   Yes.

Q   Did anyone help you write the declaration?

A   I don't want to respond to that.

Q   Why?

A   Because like I said earlier, I am not going to mention other names and other involvements, for their safety and my safety.

MR. STOCKWELL:  Standing objection. I will object you not to answer.

She is stating that she has safety concerns around answering that question.

(Video played.)

Q   (By Mr. Roy)  What did you say there?

A   And I'm not going to mention anything for everybody's safety.

Q   You are not going to go any further?

A   No.

MR. ROY:  Why don't we take a five-minute break while we transition.

(Recess 11:48 a.m. to 12:00 p.m.)

Q   (By Mr. Roy)  Ma'am, do you recognize who this individual is?

A   Yes.

Q   Who is Henok?

A   He's a journalist.

Q   A journalist for who?

A   He was for ERISAT.

we are all justice seekers.  That's how we met.

Q    When you say "we are all justice seekers," what does that mean?  Is that an organization?

A    When I mention justice seekers, I am talking about Eritrea, justice in Eritrea.

Q    But is that an organization or is that just a catch phrase?

A    We are fighting for justice.

I am an activist, and my activism is to free Eritrea, justice in Eritrea.

Q    What position does Awet hold in Yiakl?

A    I do not disclose.

Q    You don't have an answer?

MR. STOCKWELL:  Why do you not want to disclose that?

THE WITNESS:  I don't want to endanger anybody.

Like I said, anything that we say and do, it goes against our family back home.

For that reason, I am not saying anything about anybody.

MR. STOCKWELL:  So that answer you think will harm third parties?

THE WITNESS:  Yes.

MR. STOCKWELL:  Standing objection.

THE WITNESS:  I won't know.

I came for myself, so I won't know who did what.

Q   (By Mr. Roy)  Do you still communicate with Yiakl members?

A   Say that again.

Q   Do you still communicate with Yiakl members?

A   I am not going to disclose that.

Q   Why?

MR. STOCKWELL:  Do you think disclosing that information would be--

THE WITNESS:  Any information-- we are justice seekers.

Any information will go against us-- our family back home.  I will repeat that again.

MR. STOCKWELL:  Standing objection.

I will direct her not to answer.

Q   (By Mr. Roy)  You knew that Yiakl would be at the protest, correct?

A   Individuals would be at the-- I know individuals would be there.

Q   My question is:

You knew that Yiakl would be at the protest, correct?

A   Individuals, not Yiakl.

Q   You knew that Awet would be at the protest, correct?

Q    You were just walking by the tent?

A    Like I said, when we got in, there was pepper spray and they were shooting, so it was chaos.

The shooting gun was security shooting.

Q    Do you recognize this individual?

Do you know Solomon?

A    I know Solomon on interviews.  I see him on interviews.

Q    Have you spoken with Solomon personally?

MR. STOCKWELL:  Objection; common interest privilege.

MR. ROY:  What is the common interest in?

MR. STOCKWELL:  They do have--

MR. ROY:  I am not asking her about defense--

MR. STOCKWELL:  You asked about communications.

Q    (By Mr. Roy)  In 2023 did you speak with Solomon?

MR. STOCKWELL:  Objection; common interest privilege.

Don't answer the question.

Q    (By Mr. Roy)  Did you and Solomon discuss meeting at the event in 2023 at the EAGS festival?

MR. STOCKWELL:  Objection; common interest privilege.

A    I think the beginning.

Q    When was the beginning?

A    2019.

Q    Was he a board member?

A    I would not answer for him.  He will answer for himself.

Q    Do you know if he was a board member?

A    I don't answer that.

            MR. STOCKWELL:  Do you think that answering that question puts people, third parties, yourself or Esayas in danger?

            THE WITNESS:  Yes.

            MR. STOCKWELL:  Standing objection.

    I will direct her not to answer.

Q    (By Mr. Roy)  Who is the third party that's in danger?

            MR. STOCKWELL:  Objection; standing objection.

    I will direct you not to answer that question.

Q    (By Mr. Roy)  Did Yiakl pay for Esayas's flight to the festival?

A    I do not know.

            MR. STOCKWELL:  Objection; speculation.

Q    (By Mr. Roy)  Did you pay your share of the Airbnb?

A    Yes.

Q    How much was that?

A    I have known her since my involvement in activism.

Q    When is that?

A    That was when Yiakl started, 2019.

Q    Was she on the board of Yiakl?

A    No.

Q    Is she associated with Yiakl?

A    I don't think so.

          MR. STOCKWELL:  Objection;
speculation.

Q    (By Mr. Roy)  Do you know if she was associated with
Yiakl in 2023?

          MR. STOCKWELL:  Objection;
speculation.

Q    (By Mr. Roy)  Please answer the question.

          MR. STOCKWELL:  Do you think that
answering that question puts her, you, or other third
parties in some reasonable danger?

          THE WITNESS:  Yes, sir.  Yes.

          MR. STOCKWELL:  Standing objection.
I will direct her not to answer.

Q    (By Mr. Roy)  Did you know that Yiakl would be at the
protest?

A    I answered that earlier.

          MR. STOCKWELL:  Objection; asked and
answered.

cities have our own movement, but when we come together, we are the Bayto. We are the Bayto Yiakl.

Q  And do the different chapters work together?

A  Through a representative.

Q  And do local chapters raise funds?

A  Like I said earlier, the $10, that's how we get going. That's all it is.

Q  Does Bayto Yiakl give money to the chapters?

A  No.

Q  Do the chapters give money to Bayto Yiakl?

A  Our membership, the $10 a month--

Q  Goes to the national, goes to--

A  Goes to Bayto Yiakl.

Q  Do you know Mehary Asrat, who is the leader of Yiakl Seattle?

A  Who?

Q  Mehary Asrat.

A  I am not speaking about any person. I am speaking about myself.

Q  I am just asking, do you know him?

MR. STOCKWELL: Do you feel that answering that question is going to put third parties or this person in question in some sort of danger?

THE WITNESS: Yes.

MR. STOCKWELL: Then I am going to

U.S. government, to the unjust things that's done here, to expose them."

INTERPRETER:  I think I was a little bit unclear, I guess.

Can we continue with the audio?  Maybe we get the context after the second ordeal.

Q   (By Mr. Roy)  Let me ask some questions.

Ma'am, who were the nine members you were referring to?

A   I am not going to answer that, as I said earlier.

Q   But you've spoke about it on--

A   But my deposition said I am not going to put anybody in danger, so Captain, you saw him, but the rest I will not mention names.

Q   I understand.

But you spoke to the world on the internet about this.

A   But I did not mention names.

MR. STOCKWELL:  Objection.  I will make the standing objection.

Let me just ask you, so you spoke, you know, on the subject, but is-- you know, is asking for more information than what is already out there, do you like reasonably believe that that creates a safety issue for you or third parties?

woman with a baby there too, knowing what was going on."

MR. ROY:  Okay.

Q   (By Mr. Roy)  We spoke about Mehary who was a Yiakl member, correct?

A   I am not disclosing that.

Q   Excuse me?

A   I am not disclosing names.

MR. STOCKWELL:  What was the question?

Q   (By Mr. Roy)  We spoke of a Mehary who was a Yiakl member, correct?

MR. STOCKWELL:  Did we?

THE WITNESS:  I didn't speak about him, but you asked me earlier, and I said I am not agreeing to discuss about any individual.

MR. STOCKWELL:  Okay.  So the objection-- the first objection is asked and answered.

As we are all used to at this point, I will just ask you if you think that discussing the contents of his questions is going to put you or third parties in risk of danger.

THE WITNESS:  Yes, especially the other people.  I don't want to put them in danger by speaking about them.

MR. STOCKWELL:  Then I will make the standing objection and direct her not to answer.

Q   So it's $50 per person for Global membership, correct?

A   So that means-- let's say if we have three of us from U.S., so you pay-- instead of $10, it's $50 because it's Global.

Q   And who does that money go to?

A   Let's say we had an event in Italy, same thing that we do here, so that's what we do.

Q   Does it pay for the transportation of Yiakl members?

A   We spend a lot of our money, so no, a majority of the time, no.

Q   Why is Yiakl financing your legal defense?

A   Say that again.

Q   Why is Yiakl financing your legal defense?

A   I did not mention that, so--

Q   Is it true?

          MR. STOCKWELL:  Objection; assumes facts not in evidence.

      Do you believe that answering his question will create a safety concern for yourself or third parties?

          THE WITNESS:  Yes.

          MR. STOCKWELL:  I will make the standing objection and will direct her not to answer.

Q   (By Mr. Roy)  Henok said on his social media channel that half of the funds came from Yiakl and the other half came from Brigade Nhamedu.

Is that true?

A   I am not going to respond to that as well.

MR. STOCKWELL:  Do you feel like answering his question is going to create safety issues for yourself or third parties?

THE WITNESS:  Yes.

MR. STOCKWELL:  I will make the standing objection and direct you not to answer.

Q   (By Mr. Roy)  Do you own property?

A   What do you mean?

Q   Do you own a house?  Do you own a rental property?

THE WITNESS:  Do I have to answer that?

Can I mention something?

MR. STOCKWELL:  I am going to object. I am going to say that this is going to be a motion to end the deposition.

Based on the fact that you are on video talking about going after these people's homes and going after getting them fired from their jobs, I think that at some point I am probably going to have to make a motion to have you, you know, excused from the case.

I am losing my words as to what the motion is, but this is-- you have made it very clear what your motives are around asking for people's property and what their

Q  Do you know anybody that has evidence of EAGS remitting funds to the Eritrean government?

A  That's not for me to answer at this moment.

Q  Why is that?

A  Because anything that I do is going to be against me, so not at this moment I don't want to answer.

MR. STOCKWELL:  Do you believe that answering that question puts you or third parties in harm's way?

THE WITNESS:  Yes.

MR. STOCKWELL:  Okay.  I will make the standing objection, and I will direct her not to answer.

Q  (By Mr. Roy)  Have you filed a police report with the allegations raised in the lawsuit?

A  Personally, no.

Q  Are you aware of any money laundering by EAGS?

A  Money laundering?

Q  Yes.

A  Not with EAGS but all the communities, that's what they do.

Q  It is only about EAGS, no other--

A  For right now, I don't have anything to answer.

Q  Okay.  Do you have any information that EAGS is involved in racketeering?

A  Say that again.

STATE OF WASHINGTON )  ss.

COUNTY OF KING       )

I, the undersigned Washington Certified Court Reporter, pursuant to RCW 5.28.010, authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify:  That the foregoing deposition of the witness named herein was taken stenographically before me and reduced to a typed format under my direction;

That I am not a relative or employee of any attorney or counsel of participant and that I am not financially or otherwise interested in the action or the outcome herein;

That the deposition as transcribed is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions, and examinations, and said transcript was prepared pursuant to the Washington Administrative Code 308-14-135 preparation guidelines.

Read and Sign was:  Requested.

TERILYNN SIMONS, CCR NO. 2047, RPR, RMR, CRR

STATE OF WASHINGTON