UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ERITREAN ASSOCIATION OF GREATER SEATTLE,<br>Plaintiff,<br>v.<br>HENOCK TECKLE GEBREKIDAN et al.,<br>Defendants. | CASE NO. 3:24-cv-05517-DGE<br>ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY (DKT. NO. 174) |

Before the Court is Defendants' motion to exclude the expert testimony of Daniel C. Quintero and Joe Essa. (Dkt. No. 174.) For the reasons that follow, the motion is GRANTED in full.

## I BACKGROUND

### A. Factual and Procedural Background

For purposes of this order, the Court assumes familiarity with the basic facts of this case. (*See* Dkt. Nos. 22, 55.) The expert disclosure deadline was November 3, 2025. (*See* Dkt. No. 105.)

Defendants filed this motion on May 6, 2026. (Dkt. No. 174.) The Court refers to Dkt. Nos. 187 and 194 for the procedural history underlying Plaintiff's motion for extension of time to file its response (Dkt. No. 182) and its subsequent motion for reconsideration when the Court denied the extension request (Dkt. No. 188). Plaintiff filed its response to the *Daubert* motion on June 4, 2026, which includes an amended expert report for Essa. (Dkt. No. 195.) Defendants filed their reply brief on June 11. (Dkt. No. 196.)

In their motion to exclude, Defendants argue the expert opinions of both Quintero and Essa should be excluded. As to Quintero, Defendants assert first that he is not qualified to offer testimony on damages in this case and further, that his expert disclosure did not meet the requirements of Federal Rule of Civil Procedure 26(a)(2)(B)(v). (Dkt. No. 174 at 4–5, 10.) Second, Defendants argue Quintero's disclosure "consists almost entirely of bald assertions of quantified damages" and is "unsupported by underlying data," making its methodology both unreliable and unhelpful to the jury. (*Id.* at 5–10.) As to Essa, Defendants argue he is not qualified to testify on Washington food safety requirements. (*Id.* at 11.) Defendants also point out that Essa's citations to Washington Administrative Code provisions in his expert disclosure are "blatantly incorrect." (*Id.* at 11–12.) Finally, Defendants argue Essa's report also fails to meet the requirements under Rule 26(a)(2)(B)(iii). (*Id.* at 13.)

In response, Plaintiff argues that because Defendants never deposed Quintero or Essa, their *Daubert* motion is "based on their rote and speculative application" of the applicable rules and legal authority. (Dkt. No. 195 at 2.) As to Quintero, Plaintiff argues his disclosure reflects a reliable application of principles and methods by quantifying each category of lost revenue and explaining how each "arises from and relates to the facts of this case." (*Id.* at 6–7.) Plaintiff pushes back on Defendants' contention that Quintero's testimony is speculative merely because

he cannot provide exact calculations of damages. (*Id.* at 7.) As to Essa, Plaintiff asserts Essa's testimony will help the jury understand facts and data unfamiliar to a layperson, including food safety risks, food contamination, and related regulatory implications. (*Id.* at 9–10.)

**B. Daniel C. Quintero**

Quintero is the "Founding Member and Managing Partner of Cartography Capital." (Dkt. No. 175-1 at 18.) He "specializes in financial and economic engineering, specifically as it relates to commercial litigation[.]" (*Id.*) He was retained by Plaintiff to "conduct a comprehensive damage assessment regarding the damages suffered by EAGS in August 2023" and to "prepare an expert report regarding the damages caused by the riot" at the Eritrean festival. (*Id.*) Based on his review of several documents, Quintero concluded EAGS had suffered a variety of damages, broken down into specific categories: lost revenue; unplanned expenses; canceled or impaired future events; security upgrades and emergency response costs; reputational harm, community disengagement, and grant network impacts; impairment of growth plans, third-party interference and retaliator conduct; and reputational and relationship repair costs. (*Id.* at 19–21.) Alongside Quintero's report is a spreadsheet titled "EAGS Festival Profit and Loss Statement" which provides a line-by-line tally of Plaintiff's claimed damages, which was apparently provided to Defendants in discovery. (*Id.* at 34–36; *see also* Dkt. No. 174 at 9.)

**C. Joe Essa**

Essa is the Founder and CEO of MKM Hospitality Group and is a "seasoned restaurant and hospitality executive with over 35 years of experience[.]" (Dkt. No. 175-1 at 12.) His disclosure details categories of testimony including "food safety risks, food contamination, and regulatory implications arising from contamination of food sold to the public at the August 2023 EAGS festival." (*Id.* at 13.) Essa's testimony reportedly details the "catastrophic breach of food

safety protocols" after the protest on the morning of August 5, which apparently violated several Food and Drug Administration ("FDA") and Washington Administrative Code ("WAC") regulations and forced EAGS to suspend the festival. (*Id.* at 13–15.)

## II DISCUSSION

### A. Legal Standard

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Additionally, Federal Rule of Civil Procedure 26(a) requires that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence" and that such witnesses must provide an expert report accompanying the disclosure. Fed. R. Civ. P. 26(a)(2)(A) and (a)(2)(B). These disclosures must comply with the court's scheduling order. Fed. R. Civ. P. 26(a)(2)(D). A different date may apply to experts "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"Before admitting expert testimony into evidence, the district court must perform a gatekeeping role of ensuring that the testimony is both relevant and reliable under Rule 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). This requires the court to determine if the expert's reasoning or methodology underlying the testimony: (1) is scientifically valid (i.e., reliable); and (2) can be applied to the facts at issue (i.e., relevant). *Daubert*, 509 U.S. at 592–593.

The reliability inquiry "requires that the expert's testimony have a reliable basis in the knowledge and experience of the relevant discipline." *Ruvalcaba-Garcia*, 923 F.3d. at 1188–1189 (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). In *Daubert*, the Supreme Court set out several factors that courts may consider in determining reliability: "(1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted." *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1193, 1201 (D. Nev. 2008), *aff'd*, 371 F. App'x 752 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 593–594). "The inquiry under Rule 702 is a 'flexible' one, and the district court has 'the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case.'" *Youngevity Int'l v. Smith*, Case No. 16-CV-704-BTM-JLB, 2019 WL 2918161, at *12 (S.D. Cal. July 5, 2019) (quoting *Kumho Tire*, 526 U.S. at 158); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("[A] trial court not only has broad latitude in determining

whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." (internal quotations omitted)).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). In other words, expert opinion is relevant if it will help the trier of fact determine a fact in issue. *Daubert*, 509 U.S. at 591. "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id.* (citing *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)).

The party seeking to introduce expert testimony evidence must show by a preponderance of the evidence that the testimony is admissible under Rule 702.

**B. Quintero's Opinions**

Defendants argue Quintero's opinions should be excluded because (1) he is not qualified, (2) his testimony does not apply specialized knowledge to the facts of the case, and (3) his report does not meet the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B). (Dkt. No. 174 at 4.)

Defendants first argue Quintero is not qualified because his primary experience in the last 20 years is as "a partner of venture capital funds," and because he worked as Chief Economist and Head of Business Advisory Services at Prometheus Partners, the law firm of counsel for Plaintiff Eduardo Roy. (*Id.*) Plaintiff counters Quintero is qualified because of his specialties in "financial and economic engineering, specifically as it relates to commercial litigation[,]" and because he has "created expert damages models[.]" (Dkt. No. 195 at 4.)

Rule 702 requires a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." The rule "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). The Court is skeptical that Quintero's general economics and financial experience renders him qualified to opine on damages in this matter. It is unclear whether the "expert damages models" Quintero has created in the past bear any relation to the types of damages asserted in this case. Also, the subject areas he has offered expert opinions about—"corporate governance, data analytics, shareholder class action, valuation, financial institutions, intellectual property, and real estate with economic litigation" (Dkt. No. 175-1 at 18)—do not appear to have any relation to the types of damages asserted in this case. *See, e.g.*, *Nationwide Transp. Fin. v. Cass Info. Servs., Inc.*, Case No. 2:04–CV–08–BES–LRL, 2006 WL 5242377, at *3 (D. Nev. Mar. 6, 2006) (finding expert not qualified to offer opinion on damages because although he had 30 years of experience in the "commercial finance industry," he was not an accountant and did not make the calculations in his own expert report). *But cf. Blockchain Innovation, LLC v. Franklin Res., Inc.*, Case No. 21-cv-08787-TSH, 2024 WL 5483606, at *18 (N.D. Cal. Oct. 22, 2024) (finding expert qualified to offer opinion on damages because he was a Certified Public Accountant ("CPA") and held an accreditation in business valuation); *Datalex (Ir.) Ltd. v. PSA, Inc.*, Case No. CV 01-06482 DDP (VBKx), 2003 WL 25667620, at *3 (C.D. Cal. Jan. 30, 2003) (finding expert qualified to opine on damages because he had 15 years of experience as a CPA and auditor).

However, even assuming Quintero is qualified, his opinions are unreliable because he does not explain the methodology by which he arrived at his damages calculations. "[T]he party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and

followed it faithfully." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 n.11 (9th Cir. 1995) ("*Daubert II*"). "The question is whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *City of Pomona v. SQM N.A. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments).

Here, Quintero explains his methodology as follows: "Mr. Quintero's assessment is based on review and analysis of:

- EAGS financial records, contracts, and insurance claims;
- Communications from business partners and government entities;
- Media coverage and public statements made by defendants;
- Police reports, medical records, and security reports;
- Program impact statements; and
- Documents provided by EAGS[.]"

(Dkt. No. 175-1 at 18.) Based on this purported methodology, Quintero determined, for example, that EAGS suffered $530,122 in lost ticket sales (based on "benchmark data" from Eritrean festivals in Washington D.C. and Dallas and "historical attendance data" from the "Seattle Eritrean Independence Day event"), $693,270 in lost food and beverage sales, and $358,887 in "[s]ecurity and law enforcement response[.]" (*Id.* at 19.) Quintero's opinion includes predicted losses that are even further afield, such as a projected losses for "at least four future events[,]" a "[s]ignificant drop in grant revenues[,]" and the need for a "Crisis PR Firm Retainer" to "counteract the narrative of political manipulation and [to] restore EAGS's credibility with funders, partners, and the public[.]" (*Id.* at 19–20.)

Absent from this methodology is any explanation whatsoever of how Quintero used this information in some objective, testable way to arrive at his opinions regarding Plaintiff's losses. Put differently, there is no way for the Court to look at the methodology, then look at the damages calculations, and "assess[] [Quintero's opinion] for reliability." *City of Pomona*, 750 F.3d at 1046 (citation omitted). Plaintiff argues only that Quintero's methods include "reviewing, researching and analyzing financial statements and forecasts, operating plans, product roadmaps, the competitive landscape, and other barriers to entry." (Dkt. No. 195 at 5.) To state the obvious, this description is vague and unhelpful, and the Court is "left without key information necessary to understand [Quintero]'s conclusion[.]" *Siqueiros v. Gen. Motors LLC*, Case No. 16-cv-07244-EMC, 2022 WL 74182, at *13 (N.D. Cal. Jan. 7, 2022). In sum, with no explanation of "precisely *how* [Quintero] went about reaching [his] conclusions[,]" *Daubert II*, 43 F.3d at 1319 (emphasis added), the Court cannot say that his methodology is reliable within the meaning of Rule 702.

Quintero's damages calculations are also not supported by underlying data. Though methodology is the "'central focus of a Daubert inquiry . . . trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable.'" *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)). Federal Rule of Evidence 702 "does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). However, if the court concludes there is "'simply too great an analytical gap between the data and the opinion proffered,'" it can exclude an expert's

opinion. (*Id.*) (citation omitted); *see also Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153–1154 (E.D. Wash. 2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)) ("The court need not admit an expert opinion that is connected to the underlying data 'only by the ipse dixit of the expert.'").

Here, Quintero's calculations of forecasted food and beverage sales appear to be untethered to the underlying data. To illustrate: EAGS projected it would sell 8,000 adult food plates at $90 per plate and 12,000 beverages at $27 per unit. (Dkt. No. 175-1 at 34.) However, according to the spreadsheet, EAGS ended up selling 2,392 adult food plates at $15 per plate and 10,060 beverages at $3 per unit. (*Id.*) As pointed out by Defendants, not only does Quintero fail to explain *how* these projected prices and sales were calculated, he also does not explain *why* his calculation for lost food and beverage sales incorporates prices that were not actually implemented at the festival. (*See* Dkt. No. 174 at 9.) In short, there is "simply too great an analytical gap between the data and the opinion offered[.]" *Elosu*, 26 F.4th at 1026 (citation and quotation marks omitted). Plaintiff does not answer these questions; instead, it contends that "[p]art of Mr. Quintero's expertise is not just crunching the numbers but knowing what numbers to crunch." (Dkt. No. 195 at 7.) But without explaining *why and how he is crunching those particular numbers*, Quintero's calculations are insufficiently connected to the underlying data to satisfy Rule 702. The Court need not permit expert testimony that rests on conclusions that are "grounded in nothing more than [Quintero's] say so." *Siqueiros*, 2022 WL 74182, at *13.

Finally, Defendants argue Quintero's opinions should be excluded for violating Federal Rule of Civil Procedure 26(a)(2)(B) because Plaintiff did not include a list of Quintero's publications, nor did it properly identify Quintero's prior testimonial experience. (Dkt. No. 174 at 2.) The failure to fully disclose expert opinions as required by Federal Rule of Civil Procedure

26(a) results in exclusion "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To determine whether failure was substantially justified or harmless, the Court looks at "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed. App'x. 705, 713 (9th Cir. 2010). "The burden is on the party facing exclusion of its expert's testimony to prove the delay was justified or harmless." *Id.*

Here, Quintero's original expert disclosure did not include the required information about his prior publication or testimonial experience, as laid out in Rule 26(a)(2)(B)(iv) and (v). (*See* Dkt. No. 175-1 at 2–5, 18–22.) This information appears to have been provided for the first time in an email from Plaintiff's counsel dated February 11, 2026—more than three months after the expert disclosure deadline. (*Id.* at 24.) Even if the Court finds the deficient disclosure was harmless or substantially justified, *see Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106–1107 (9th Cir. 2001), Plaintiff offers no justification for its failure to fully comply with Rule 26(a) from the outset. "The remedy for inadequate disclosure, as with late disclosure, is exclusion." *Killinger v. Progressive Direct Ins. Co.*, Case No. 2:22-CV-0012-MKD, 2023 WL 6190898, at *5 (E.D. Wash. 2023) (citing *Yeti*, 259 F.3d at 1107).

In conclusion, the Court GRANTS Defendants' motion to exclude Quintero's opinions.

**C. Essa's Opinions**

1. <u>Defendants' Request to Strike Plaintiff's Response Brief and Essa's Amended Disclosure</u>

As a threshold matter, the Court addresses Defendants' request to strike (1) the portions of Plaintiff's response brief that expand upon the previously filed version that was stricken by

the Court (*see* Dkt. Nos. 186, 187) and (2) the portions of Essa's amended disclosure that do not comport with his original expert disclosure. (Dkt. No. 196 at 3–4.)

First, when the Court permitted Plaintiff to refile its response to Defendants' *Daubert* motion, it did not restrict Plaintiff's response to what it had originally filed. (*See* Dkt. No. 194 at 2) (permitting Plaintiff to file its response). In any event, Defendants were not prejudiced by the expanded response because they had an opportunity to respond to any new arguments raised by Plaintiff in their reply brief. Accordingly, the Court DENIES Defendants' request to strike Plaintiff's response brief, despite the fact it is longer than the stricken response brief.

However, as Defendants identify, Plaintiff attached an amended expert disclosure for Essa in its June 4 response. (*See* Dkt. No. 195 at 14–27.) Upon the Court's review, the amended expert disclosure contains the following information that was not included in Essa's original expert disclosure:

- "Mr. Essa has not authored any publications in the past ten years." (¶ 5)
- "Mr. Essa has not testified as an expert at trial or deposition in the past four years." (¶ 6)
- "[Essa will testify on] [t]he food safety implications of a German Shepherd dog being brought into the food safety zone during the mob intrusion, including the regulatory consequences under Washington State Retail Food Code and federal FDA/FSMA standards." (¶ 7)
- "[Essa will testify on] [t]he operational and food safety consequences of the generators being disabled during the intrusion, including loss of temperature control, interruption of required refrigeration, and the triggering of imminent health hazard protocols under state and federal food safety law." (¶ 7)

- "The introduction of a German Shepherd dog into the food safety zone constituted an additional breach of food safety controls, as animals are prohibited in food preparation, storage, and service areas under WAC 246-215-06570, and their presence creates biological contamination risks including fur, dander, saliva, and fecal-borne pathogens. The German Shepherd dog intrusion also violated FDA Food Code 3-302.15 (defines allowed corrective actions for washing food; applies only to remove soil and similar contaminants), FDA Food Code 6-501.115 (Live animals may not be allowed on the premises of food established safety zones), FDA Food Code 8-404.11 (imminent health hazard requiring cessation of operations), and FSMA Preventive Controls (21 CFR 117), which require mitigation of foreseeable hazards such as animal intrusion. If contamination occurs outside the scope of 3-302.15 (i.e., not soil on produce), then washing is not a permitted corrective action, and the operator must follow 8-404.11." (¶ 13)
- "The presence of the German Shepherd dog further compromised the chain of custody and sanitation integrity of the food service environment, requiring disposal of exposed food and sanitation consistent with FDA Food Code 8-404.12 and WAC 246-245-08455." (¶ 14)
- "The disabling of generators during the intrusion constituted an additional imminent health hazard. Loss of electrical power directly compromises required cold-holding and hot-holding temperatures, violates FDA Food Code 3-501.16-19, and triggers mandatory cessation of operations under FDA Food Code 8-404.12 and WAC 246-245-08455. The inability to maintain refrigeration or temperature control requires disposal of time/temperature-controlled foods and full sanitation before resuming operations." (¶ 15)

- "[EAGS]'s decision to suspend operations, dispose of food, and sanitize the facility was consistent with federal and state food safety regulations, including:"
    - FDA Food Code 3-501.16;
    - FDA Food Code 3-307.11;
    - FDA Food Code 6-501.115;
    - "FSMA Intentional Adulteration (21 CFR Part 121)";
    - WAC 214-215-02115;
    - WAC 246-215-09220;
    - WAC 246-215-03375;
    - WAC 246-215-06570;
    - WAC 246-245-08455;
    - WAC 216-215-03100;
    - WAC 246-215-03700; and
    - WAC 246-215-03705. (¶ 16)
- "The attempts to trigger the fire alarms during food preparation and food sales, which required food service personnel to maintain high alert of food areas to repeatedly make risk assessments, re-sanitization of food zones, and revalidation of safety procedures under heightened regulatory scrutiny." (¶ 22)
- "I also reviewed scientific and regulatory literature regarding animal intrusion into food service areas, including contamination pathways associated with German Shepherd dogs." (¶ 25)

- "I reviewed regulatory requirements relating to loss of power, generator failure, and temperature-control violations, include FDA Food Code 3-501.16-19, 8-404.11, and WAC 246-215-02115(2)." (¶ 27)
- "I also reviewed video evidence documenting the presence of a German Shepherd dog brought into the food safety zone during the mob intrusion." (¶ 33)
- "I reviewed evidence that generators were disabled during the intrusion, resulting in loss of power and temperature control in the food service environment." (¶ 34)
- "Exhibit F: Regulatory materials relating to animal intrusion into food service areas involving a German Shepherd dog." (¶ 40)

(*Compare* Dkt. No. 175-1 at 12–16 *with* Dkt. No. 195 at 14–27.)

Essa's amended disclosure is untimely and improper. *See* Fed. R. Civ. P. 26(a)(2)(D). The expert disclosure deadline in this matter was November 3, 2025 (Dkt. No. 105)—more than six months ago. Further, Plaintiff's response brief is an "unauthorized supplemental expert disclosure," which does not explain why or how this information was not included in Essa's original expert report, and therefore it is excludable. *E.g.*, *Williams v. Thompson*, Case No. 3:16-cv-2074-AC, 2018 WL 10648672, at *12 (D. Or. Sept. 12, 2018) (excluding expert testimony filed more than four months after the expert disclosure deadline). Plaintiff's attempt to supplement Essa's expert disclosure as part of its response brief is prejudicial to Defendants because it potentially implicates different litigation strategies, such as taking Essa's deposition, which Defendants are now precluded from pursuing. Accordingly, the above information is STRICKEN from Essa's expert report and will not be considered in the Court's evaluation of Defendants' motion to exclude.

2. Analysis of Essa's Qualifications and Opinions

The Court now analyzes Defendants' *Daubert* motion challenging the sufficiency of Essa's remaining expert opinions under Rule 702.

First, Defendants argue Essa is not a qualified expert on Washington food safety requirements, because his background "reflect[s] hospitality operations leadership and board roles[,]" rather than scientific experience, and because he does not claim to have any specific knowledge of Washington food regulations. (Dkt. No. 174 at 11.) Rule 702 requires a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." The rule "contemplates a broad conception of expert qualifications." *Thomas*, 42 F.3d at 1269. "[B]efore admitting expert testimony, the district court must perform a gatekeeping role to ensure that the testimony is both relevant and reliable." *United States v. Valencia-Lopez*, 971 F.3d 891, 897–898 (9th Cir. 2020) (citations and alterations omitted).

Here, though Essa has 35 years of experience "leading global restaurant brands and consumer facing food businesses[]" (Dkt. No. 195 at 15), his experience appears to be exclusively on the business side of the food and beverage industry. (*See id.* at 25–27) (describing current experience at MKM Hospitality Group as "provid[ing] strategic advisory, operational support and investment services to hospitality companies" and listing past executive experience in restaurant groups and restaurant companies). While an expert's experience can provide the basis for their qualifications, *see Thomas*, 42 F.3d at 1269–1270, nothing about Essa's experience indicates he has any expertise or knowledge in the area of food safety regulations or standards that would be helpful to a jury. In acting in its role as a gatekeeper, the Court is not satisfied that Essa's opinion, used as intended by Plaintiff, meets the reliability requirements of Rule 702.

Second, Defendants argue Essa's citations in his initial expert disclosure to Washington Administrative Code regulations are "blatantly incorrect." (Dkt. No. 174 at 11.) This, too, goes to reliability—these citations would not be helpful to a jury in understanding the food safety concerns raised by Plaintiff following the August 5 protest *because they do not exist*. Fed. R. Evid. 702; *Valencia-Lopez*, 971 F.3d at 897–898 (citations and alterations omitted). Further, the attempts by Plaintiff to provide corrected citations to Washington regulatory provisions have been stricken because they are inconsistent with Essa's original expert disclosure; the Court therefore does not consider them. *See* Section III(C)(1) *supra*.

Third, Defendants argue Essa's report is not supported by underlying facts or data because Plaintiff failed to include the exhibits reviewed by Essa in its expert disclosure. (Dkt. No. 174 at 13; *see also* Dkt. No. 196 at 6–7.) Essa did not produce the documents he relied on in forming his expert opinion in either his original expert disclosure or amended disclosure (*see* Dkt. Nos. 175-1 at 12–16; 195 at 14–27), though Plaintiff states "[m]ost" of the exhibits were produced in discovery. (*See* Dkt. No. 195 at 10.) There are two separate reasons for excluding Essa's opinion on these grounds. First, the documents Essa apparently relied upon are labeled imprecisely (i.e., "Exhibit B: Food Safety Risk Matrix for Riot-Affected Zones" and "Exhibit C: Regulatory Protocols Triggered by Unauthorized Entry"). (Dkt. No. 195 at 23.) Even if these documents were produced in discovery, their titles in Essa's report are unhelpful—and therefore his expert disclosure is unreliable—because there is no way to confirm based on the document descriptions what information they contain or where they may be located. Second, the failure to provide the documents is inconsistent with the spirit of Federal Rule of Civil Procedure 26(a)(2)(B)(iii), which requires the party proffering expert testimony to provide "any exhibits that will be used to summarize or support" the expert's opinions. In the Court's mind, the

justification underlying Rule 26(a)(2)(B) is to allow the opposing party to understand the expert's qualifications and the basis for their opinions such that they may depose the expert, offer a rebuttal expert, or attack the expert's opinion in a *Daubert* motion such as this. Vaguely referring to documents, as Plaintiff did here, and stating "[m]ost" of them were produced in discovery, does not give Defendants the opportunity to understand what Essa reviewed in formulating his opinion.

Finally, Defendants argue Plaintiff violated Federal Rule of Civil Procedure 26(a)(2)(B) because Essa's expert disclosure did not include information about his past publications or testimonial experience. (Dkt. No. 174 at 2.) Essa's disclosure does not include the information required under Rule 26(a)(2)(B), namely, "a list of all publications authored in the previous 10 years" and "a list of all other cases in which, during the previous 4 years, the witness testified as an expert[.]" Fed. R. Civ. P. 26(a)(2)(B)(iv)–(v). As with the missing information from Quintero's report, the information missing from Essa's report appears to have been provided in an email from Plaintiff's counsel in February 2026, several months past the expert disclosure deadline. (*See* Dkt. No. 175-1 at 24.) Plaintiff again does not explain why it failed to fully comply with Rule 26(a)(2)(B) initially. Such a failure also provides a basis for exclusion of Essa's opinion. *See Killinger*, 2023 WL 6190898, at *5 (citation omitted) ("The remedy for inadequate disclosure, as with late disclosure, is exclusion.").

For the reasons identified, the Court GRANTS Defendants' motion to exclude Essa's opinions.

## III CONCLUSION

Accordingly, the Court GRANTS Defendants' motion to exclude (Dkt. No. 174) in full.

Dated this 31st day of July 2026.

David G. Estudillo
United States District Judge